## Case No. 14,183.

### The TRIUMPH.

[1 Spr. 428;[1] 21 Law Rep. 612.]

District Court, D. Massachusetts. July, 1858.

SALVAGE—WHO MAY BE SALVORS—SEAMAN.

1. A seaman may be a salvor of his own vessel, after his contract of service shall have been dissolved. He may be absolved from his allegiance to the ship, by being deserted by the master and the rest of the ship's company.

[Cited in The Olive Branch, Case No. 10,490; The C. P. Minch, 61 Fed. 512.]

2. The case of Mason v. The Blaireau [2 Cranch (6 U. S.) 240].

3. Amount of salvage compensation.

[This was a suit brought against the vessel Triumph, Artis, claimant, for an alleged salvage service.]

H. A. Scudder, for libellant.

A. H. Fiske, for claimant.

SPRAGUE, District Judge. This is a libel for salvage by Knowlton, one of the crew. The facts proved are as follows: The libellant shipped, as cook, on board of this vessel, for a voyage from Philadelphia to Boston and back. On the 24th of June last she sailed for Boston, laden with coal. On the 30th, being off Cape Cod, at about eleven o'clock at night, she came in collision with another vessel, called the Elisha T. Smith, which struck her starboard quarter, broke off some of her stanchions, injured the main boom and the house on deck, and tore the mainsail so as to render it useless. The wind was northeast, and so strong that the topsails and flying jib had been taken in, and she was under her mainsail, foresail and jib only. Highland light was in sight; at what distance, is variously stated from six to fifteen miles. The crew consisted of the master, one mate, three foremast hands, and the libellant. At the time of the collision, the libellant was in his berth, asleep; one other seaman also was below. The master, mate, and two seamen were on deck, all of whom immediately deserted the schooner, and got on board the colliding vessel. The seaman who was below also got on board of her, by jumping overboard and swimming to her. The libellant, being roused by the crash, ran on deck, found no one there excepting one seaman, whom he soon afterwards saw getting up the side of the other vessel. Finding himself alone, he hailed the other vessel, and begged that he might not be deserted. The master of the Triumph says that, before he left his vessel, he called the libellant, and, after getting on board of the Elisha T. Smith, he besought her master not to leave the libellant, but he refused to comply, lest by delay he should vacate his insurance, and proceeded on his voyage. The libellant states that, after being thus deserted, he

first rigged the pump, and worked it for some time; he then secured the main boom, the rope which held it to the mast having been broken, and the block for the main sheet being out of the strop. He next pumped for awhile, and then searched for a leak, and believing that the water came in between the skin of the vessel and the timbers below, took cotton wool from some of the bedding, and with a case-knife, calked, as well as he could, around and near the stanchions that had been broken. He also stuffed a mattress and pillows into a hole in the house, through which, it was apprehended, water might be dashed by the waves into the cabin. About this time another vessel came near, which he hailed, stating his condition and begging for assistance, which she refused, and kept on her course. Up to this time the starboard, that is the wounded side of the vessel, was to leeward and the water came on to her deck. The libellant then took the helm and wore round, so as to bring the starboard side to windward, and more out of water. The mainsail having been destroyed, the only sails set were the foresail and jib. He put a signal of distress into the main rigging, and steered toward Highland light, and by daybreak was not far from the land. The wind and sea had abated. He ran along parallel to the shore for some time, when another vessel came within speaking distance; from her, also, he begged for aid. She declined rendering any, but told him that, if he ran down off Harwich, boats would come to his relief. He did so, and at about half-past eight o'clock in the morning, a boat from that place, with seven men, came to his assistance. They anchored the vessel off Harwich, got a new mainsail, nailed boards over the stanchions that had been broken off, and over the hole in the house, and then got under way for Provincetown, which they reached the next morning.

It is contended by the claimant, first, that the libellant rendered no service; and, second, that if he did, being one of the crew, he was bound by his contract to use his utmost exertions for the preservation of the vessel, and could not, therefore, be a salvor. I do not think that the statement of the libellant is to be wholly disregarded; and although the vessel leaked very little, if any, yet I am satisfied that his exertions contributed to her safety.

As to the second objection, the claim of the seaman, Toole, in the case of Mason v. The Blaireau, 2 Cranch [6 U. S.] 240, is, in all circumstances which affect the right to assume the character of salvor, like the present. It is true that Toole alleged that his remaining on board of The Blaireau was, in some degree, voluntary. But the opinion of the court states that he was deserted, and the decree is placed on that ground. Some differences between the two cases have been suggested,

[1] [Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

but they are too minute to be worthy of remark. It is contended, however, that the case of Mason v. The Blaireau is antiquated; that it was decided when the law was not well understood, and that it is now settled that a seaman cannot be a salvor of his own vessel. If this were so, I should regret it, for instead of being an advance in sound jurisprudence, it would be the reverse. But it is not so. The case of Mason v. The Blaireau is not shaken, but strengthened and confirmed by subsequent opinions. Chancellor Kent sustains it by the authority of his name, laying down the same doctrine in the third volume of his commentaries (page 197). In Hobart v. Drogan, 10 Pet. [35 U. S.] 122, Judge Story, in delivering the opinion of the court, after stating that cases might exist in which seamen might be salvors, says "such was the case of the seaman left on board, in the case of Mason v. The Blaireau, 2 Cranch [6 U. S.] 268." And as late as the year 1853, Dr. Lushington, in the case of The Florence, 20 Law & Eq. Rep. 607, cites the case of Mason v. The Blaireau with approbation, and judicially adopts its doctrines. The case of The John Perkins, decided by Mr. Justice Curtis in this circuit [Case No. 7,360]. is relied upon, as maintaining the position that a seaman cannot be a salvor of his own vessel. But that case was essentially different from the present. The vital question is, had the contract with the seaman been dissolved?—that is, was he bound to render the service for which he claims salvage compensation, or had he been previously discharged from all obligation under his contract? Now in Mason v. The Blaireau it is held, that the absolute desertion of a ship with a seaman on board, by the master and rest of the crew, sine spe revertendi, was a dissolution of his contract, and absolved him from his allegiance to her. In the case of The John Perkins [supra] there was no such desertion of the vessel. The master, and all the crew but one, left her by reason of danger from the ice, with the intention of watching her from the shore, to contribute to her preservation as far as might be in their power, and to return to her, if practicable, and they actually did return to her. None of the seamen were discharged; they were allowed by the master the option of going ashore for the time being, or of remaining on board. One chose to remain, but all continued under his authority, and subject to his command. As to the amount of salvage that should be awarded, little aid can be derived from the case of Mason v. The Blaireau. There the property saved exceeded $60,000, and the damage and peril of the ship were very much greater, and the salvors were for a long time in great danger, and subjected to severe labor. Here the property was only $5,000, and the time it was in jeopardy was short. In a day or two after the Triumph was brought into Provincetown, her master, who was

also part owner and ship's husband, reached that place. He settled with the seven men from Harwich by paying them $900, a liberal salvage compensation. Some negotiation was had with the libellant. One witness, a general agent of underwriters, testified that the highest sum claimed by the libellant was $200. The libellant himself stated that it was $300. Upon consideration I shall decree to the libellant the latter sum. There is a part of the history of this case which invites some general remarks. It is true policy to offer such pecuniary inducements, by salvage compensation, to those who happen to be in a situation to aid in rescuing property from extraordinary peril from the sea, as will induce them to render that aid promptly and efficiently. I am aware that underwriters have generally deemed the rate of salvage compensation allowed by the courts to be far too liberal. But we here see not only property, but life, in peril on the ocean, and yet three vessels in a situation to render aid, and implored by the man whose life was at stake, to do so, all refuse his request. The first, the colliding vessel herself, would not lie by, or delay, a moment, from fear of pecuniary loss; the second follows her example, without assigning any reason. Both, in the darkness of the night, keep on their course, without pause, leaving this solitary mariner and his crippled vessel to any fate to which the wind and the waves might devote them. The third vessel, in broad daylight, was so little influenced by any prospect of reward, that she chose rather to leave the libellant and his vessel to the chance of being seen and succored from the shore, than to render any assistance herself. Now if the policy of the law, and of the courts who administer it, had accomplished their purpose, the master of each of these vessels, from the mere hope of gain, independent of motives of humanity, would at once have arrested her course, and given all needful assistance with promptitude and energy. Decree for $300 and costs.

See The Holder Borden [Case No. 6,600], and note.