## Case No. 17,300.

### The WAVE v. HYER et al.

[2 Paine, 131.] [1]

Circuit Court, S. D. New York.[1], [2]

RIGHT OF PILOT TO SALVAGE—LAWS OF NEW YORK—RECOVERY FOR PILOT'S SERVICES—JURISDICTION OF ADMIRALTY COURT.

1. A salvor is one who, without any particular relation to a vessel in distress, proffers useful service, and gives it as a volunteer adventurer, without any pre-existing covenant that connected him with the duty of employing himself for the preservation of the vessel.

2. Salvage is not allowed in cases where it would hold out a temptation to a dereliction of duty; and therefore, in general, seamen, pilots and passengers cannot sustain a claim for salvage for the ordinary assistance they may have afforded a vessel in distress, it being no more than their duty; but for extraordinary exertions beyond their duty, such claim has been, by the general maritime law, sometimes, though very rarely, allowed and admitted with extreme caution.

[Cited in The C. D. Bryant, 19 Fed. 605; The C. P. Minch, 61 Fed. 513.]

3. And where the service performed is required by law as a duty, it is a rule admitting of no exception that it cannot be set up as a salvage service.

4. And therefore, where the laws of New York (adopted by congress) make it a part of the official duty of pilots to assist vessels in distress, it was held that they were not entitled to salvage for rendering such assistance.

[Cited in Flanders v. Tripp, Case No. 4,854.]

5. The rule of the common law courts of England that a pilot cannot sue in admiralty on a contract for services to be performed on a navigable river, or waters within the body of a county, does not prevail here. Pilotage services partake so much of a maritime character, that under our system and the grant of admiralty and maritime jurisdiction to the district courts, such a suit may be maintained in those courts in the absence of any legislative provision on the subject of pilotage.

[Cited in The California, Case No. 2,312.]

6. But the jurisdiction of the district courts is not exclusive over such cases. There is nothing in the nature of the remedy or of the subject-matter which can take away the jurisdiction of the common law courts. And the saving in the judiciary act of the right to a common law remedy, is a full recognition of a concurrent jurisdiction in those courts of cases which may be denominated admiralty and maritime causes, where they before had such jurisdiction.

7. Nor is the mere grant in the constitution of cases of admiralty and maritime jurisdiction to the courts of the Union necessarily exclusive, nor a denial of the exercise of jurisdiction by the courts of the state in such cases. Congress, however, might, under its power to regulate commerce, establish by law a system of pilotage in ports and harbors, and give its courts exclusive jurisdiction of cases arising under such law.

8. In the state of New York, however, the district courts have no jurisdiction at all over cases of pilotage service: congress has adopted the law of the state regulating pilots, and that law has provided for compensating pilots for both ordinary and extraordinary services of all kinds, and has given to the board of wardens power to

decide what such compensation shall be. And congress having adopted the state law previously to the passage of the judiciary act, cases of pilotage service were not embraced in the general obligation of admiralty and maritime jurisdiction to the district courts within the state.

9. The legislature may superadd to the ordinary duties of a pilot any others which it may think proper; and the law of New York having provided for the payment of pilots who should exert themselves for the preservation of vessels appearing in distress and in want of a pilot on the coast, it was held that the degree of distress could not change the character of the service, or convert pilots into salvors, so as to give the district court jurisdiction.

10. The schooner Wave, in leaving the port of New York, when nearly opposite the Quarantine Ground, struck a cake of ice which cut a hole in the bottom of the vessel, and when near Sandy Hook she was water-logged and in a sinking condition, and with great difficulty kept above water. She fired guns and made signals for a pilot. and afterwards signals of distress. The pilot-boat Gazette, being about two miles distant, and coming into port, manned and owned by the libellants. who were all pilots of the port, made for the Wave, rendered her all the assistance in their power, stopped her leak, and saved her from sinking or being run ashore. They also transferred a part of her cargo to the pilot boat and brought it to the city, and one of them remained on board the Wave until she reached the city, after three days of troublesome navigation. Held, that there was no claim for salvage.

This case came up on appeal from the district court of the United States for the Southern district of New York. It was argued at the May term of this court, and lay over for advisement until the October term. The respondents libelled the Wave, in the court below, for salvage. They were all at the time of the services rendered the Wave, either branch or deputy pilots of the port of New York, duly commissioned under the laws of the state, and, as such, jointly owned the pilot-boat Gazette, for whose services, and those of her crew, the libel to obtain salvage was filed. The Wave sailed from New York on the 2d of February, 1831, bound for Brazos, in Mexico. Previous to this time, the piers and slips had for several days been so blocked up with ice as to prevent vessels from putting to sea, unless by watching a favorable moment. On the 2d, the Wave, having had signals standing the day previously and that day for a pilot, and not being able to get one, although one had been on board of her and promised to return, took advantage of an opening in the ice, got into the stream, and had every prospect of getting safely to sea without one; but when nearly opposite the Quarantine Ground, she ran into a field of ice, and struck a cake which cut a hole in the bottom of the vessel: and when near Sandy Hook, she was water-logged and in a sinking condition, the crew exerting themselves greatly to keep her above water. They fired guns and made signals for a pilot, and afterwards signals of distress, in consequence of which the pilot-boat Gazette, under the command of John Hyer, which was about two miles distant, coming into port, made for the Wave, and soon reached her. Capt. Hyer

[1] [Reported by Elijah Paine, Jr., Esq. Date not given. 2 Paine includes cases decided between 1827 and 1840.]

[2] [Reversing Case No. 17,297.]

and his men (one of whom was the pilot who had that morning been on board the Wave while lying at the wharf, and promised to return and pilot her out, but who did not return) immediately rendered all the assistance in their power to free the vessel and stop her leak, in which they were successful. They also, with the assistance of the crew of the Wave, transferred a part of the cargo of the latter to the pilot boat, and in this condition both vessels returned to the city—the pilot boat directly—but the Wave, with Capt. Hyer on board, having to encounter rough and cold weather, and delay, not reaching the city until the 5th of February. The assistance rendered by the pilots was probably the means of preventing the Wave from sinking or being run on shore, as there was no appearance of any other relief. Capt. Hyer, soon after going on board the Wave, obtained from Capt. Harriman, her master, a document purporting to resign her into the former's charge, and which, it was insisted by the libellants, showed that he did not take charge of her in his character of pilot. The court below decreed the sum of $1,103.78 as salvage, with costs and counsel fees to the libellants. [Case No. 17.297.]

On appeal from this decree, W. Slosson on the part of the owners of the cargo, and E. Paine and A. W. Dodge for the owners of the vessel, contended for the following positions, in opposition to the principles of the decree:

1. That the district court had no jurisdiction of the case, the same having been given, by the laws of the state, exclusively to the wardens of the port of New York, who were to determine the compensation to be allowed to pilots for extraordinary services rendered to vessels in distress (Act Feb. 19th, 1819; 5 Sess. Laws, art. 11, § 19); and that it was impolitic to interfere with the regulations of the state on this subject, which had adopted a complete system for the government and compensation of its pilots, placing them under the control of the board of wardens, which was created principally to have charge of them. That such a supervision was peculiarly necessary over a body of men brought and kept together by law, entrusted with duties so important to commerce and humanity, enjoying certain exclusive privileges, and exposed to the temptation, and having the opportunity of abusing their trust; and that this supervision, given to the wardens, ought to be left entire, and not be interfered with.

2. That congress, under its constitutional power to regulate commerce, had passed a law leaving the regulation of their pilots in port to the several states. That congress could lawfully do this, and was not obliged by the constitution to vest in the courts of the United States jurisdiction over cases which were, by the pilot laws of the state, vested in its own tribunals, although such cases might otherwise have belonged to the admiralty jurisdiction; and that as this law was passed by the same congress as that which passed the judiciary act, giving the district court its admiralty jurisdic-

tion, and only a few weeks before the passage of the judiciary act, it was clear congress did not intend to give that court jurisdiction over pilots, where it was already vested by the state, in its own courts.

3. That the pilots in this case had done no more than they were required to do by law— no more than their duty; and that it was an invariable principle that no one could entitle himself to salvage by performing his duty. And that, besides, they were not entitled to compensation on salvage principles, and of course could not sue as salvors.

4. That if this was to be deemed a case of pilotage, however extraordinary the compensation to which the pilots might be entitled, a court of admiralty has no jurisdiction over it, as it occurred within the body of a county; and, being a common law case, the common law courts have exclusive jurisdiction of it.

5. That the libellants, being out in their boat in discharge of their official duties at the time they boarded the Wave, could not, by any agreement with her captain, divest themselves of their official character; and that the attempt to do it was a fraud upon the law. 1 Caines, 104. That the act of the state requires pilots, on boarding a vessel, to exhibit their printed instructions from the wardens, under a penalty of ten dollars; and that this provision was obviously designed to prevent their assuming to act in any other capacity. Section 18.

A. Burr and W. Q. Morton, on behalf of the libellants, controverted these positions, and supported the decree.

THOMPSON, Circuit Justice. The respondents filed a libel in the district court, claiming an allowance as salvors of the schooner Wave and her cargo; and the court, by its decree, allowed as salvage one-tenth of the appraised value of the vessel and cargo to the libellants, amounting to $1,103.78. From this decree an appeal has been taken to this court. Some of the questions involved in the discussion at the bar, as connected with the circumstances of this case, are new, and by no means free of difficulty. In our complicated system of government, questions of jurisdiction must necessarily frequently arise; they are at all times interesting and sometimes doubtful and minds equally enlightened and equally aiming at correct results, may nevertheless arrive at different conclusions.

It will not be necessary for me, under the view which I have taken of the case, to enter into a particular examination of all the points which have been made and discussed at the bar. I shall confine myself strictly to this case, which requires me only to decide, whether the libellants in the court below, being pilots of the port of New York, appointed under the authority of the state, could, for the services rendered by them, sustain in the district court a claim for salvage.[3]

It is admitted that the libellants are pilots,

---

[3] [See note at end of case.]

or officers holding some station in the pilotage establishment for the port of New York, and deriving their authority from the laws of the state of New York; and that the whole service was performed within the jurisdiction of the state, and within the range of the pilotage establishment.

The character in which the libellants were acting, is important in no other point of view than for the purpose of deciding what duty was imposed upon them as pilots with respect to this vessel under the circumstances in which she was found; for I apprehend, if they did no more than was their duty to do as pilots, it is very clear they cannot set themselves up as salvors. We have in the case of The Neptune. 1 Hagg. Adm. 227, Lord Stowell's explanation or description of the character of a salvor, which is perhaps as accurate as is anywhere to be found in the books. A salvor, says he, is a person who, without any particular relation to a ship in distress, proffers useful service, and gives it as a volunteer adventurer, without any pre-existing covenant that connected him with the duty of employing himself for the preservation of that ship; and, therefore, he says, the crew of a ship whose stipulated duty it is to protect that ship through all perils. cannot be considered salvors. He adds, that he will not say a case cannot exist where they might claim as salvors, but they must be very extraordinary circumstances indeed, for the general rule is very strong and inflexible. that they are not permitted to assume that character. They are excluded upon just grounds, although a liberal allowance in meritorious cases is founded in sound policy, as holding out strong inducements to men to exert themselves in the preservation of lives and property about to perish at sea; yet when such allowance is claimed by men who have a duty to discharge in the preservation of such property, great care should be taken not to hold out a temptation to a dereliction of duty. Hence it is, that in general. seamen, pilots and passengers cannot sustain a claim for salvage for the ordinary assistance they may have afforded a vessel in distress, it being no more than their duty; but for extraordinary exertions beyond their duty, such claim has been sometimes, though very rarely, allowed: always, however, accompanied by remarks showing the extreme caution with which such claim is admitted. This is fully exemplified in the case of The Neptune. already referred to, which was a claim of salvage by seamen. And the like language was held by the same judge as applicable to the claim of salvage by a pilot in the case of The Joseph Harvey, 1 C. Rob. Adm. 306. It may be, says he, in an extraordinary case, difficult to distinguish a case of pilotage from a case of salvage. properly so called, for it is possible that the safe conduct of a ship into port. under circumstances of extreme danger and personal exertion. may exalt a pilotage service into something of a salvage service, but in general they are distinguishable enough, and the pilot, though he contributes to the safety of the ship, is not to claim as a legal salvor. So, in the case of Mason v. The Blareau, 2 Cranch [6 U. S.] 240, in the supreme court of the United States, salvage was allowed a seaman under extraordinary circumstances, where the ship had been abandoned by the master and crew, and the seaman claiming salvage was considered as discharged from his contract as a mariner, and of course had no further duty as such to discharge. The case of Dulany v. The Peragio [Case No. 4,123], decided in South Carolina, contains no doctrine at variance with the view I have taken of the one now before the court, but is in accordance with it in principle. The judge says, this case comes before the court as a case of salvage, but, on a full investigation of the evidence, it does not seem to be altogether such. The pilot took the sloop in tow, and it is admitted some compensation is due over and above the usual rate of pilotage. And as no question of law arose in the case, and he had consulted persons conversant in these matters, none of whom considered it a case of salvage, but all agreed compensation should be allowed, by way of encouragement to pilots to do more than their mere duty, he allowed $200. Here, although it was considered that the pilot did more than was strictly his duty, the court did not consider it a case of salvage.

The rule which governs all these cases is founded upon the soundest principles of justice and public policy, and is fully recognized by Mr. Justice Washington in the case of Le Tigre [Case No. 8,281]. When, says he, the service for which the compensation is claimed by a public officer is required of him by the law virtute officii, or it becomes a duty necessarily connected with his public employment, we can perceive the most obvious reasons why a compensation beyond what the law allows should not be claimed from the owner of the property saved. And he mentions pilots as a class of officers falling within this rule. I am not disposed in the least to call in question the jurisdiction of the district court. as a court of admiralty. over suits for pilotage upon the high seas; nor. in denying the jurisdiction of the district court in this case. is it necessary that I should sustain the doctrine of the common law courts in England as to the jurisdiction of the admiralty; or hold, that if the contract be for services to be performed on a navigable river or waters within the body of a county, no suit will lie in the admiralty in favor of the pilot for such services. 2 Wils. 264. It may be admitted that pilotage services partake so much of a maritime character, that under our system, and the grant of admiralty and maritime jurisdiction to the district courts, those courts. in the absence of any legislative provision on the subject of pilotage, may sustain suits for such services, although performed within the body of a county. But it must be borne in mind that pilotage services are not so exclusively of a maritime character

that common law courts do not take cognizance of suits for such services, even when performed upon the high seas. 2 Bos. & P. 612; 10 Johns. 112; 1 Caines, 105. There is nothing in the nature of the remedy, or the subject-matter, which can take away the jurisdiction of the common law courts. The saving in the judiciary act (section 9) to all suitors the right of a common law remedy, when the common law is competent to give it, is a full recognition of a concurrent jurisdiction in the common law courts, of cases that may be denominated admiralty and maritime causes. And it is certain, as matter of fact, that the state courts take an extensive and heretofore unquestioned cognizance of maritime contracts, and on the ground that they are not cases, strictly and technically speaking, of admiralty jurisdiction. But if the cognizance of the district court over all maritime contracts and causes of action be exclusive, the jurisdiction of the state courts in such cases could not be sustained. 1 Kent, Comm. 351.

Congress, under the power to regulate commerce, might doubtless establish by law a system of pilotage in ports and harbors within the territorial limits of the states, and give to the district courts jurisdiction of all cases arising under such law. But the cession by the states of all cases of admiralty and maritime jurisdiction, cannot be construed into a cession of the waters on which those cases may arise. The jurisdiction of the state, and its right to legislate, is co-extensive with its territory, and is still retained, except so far as it has been ceded to the United States. [U. S. v. Bevans] 3 Wheat. [16 U. S.] 386. Although the constitution of the United States declares that the judicial power of the Union shall extend to all cases of admiralty and maritime jurisdiction, yet the courts of the United States do not exercise criminal jurisdiction over maritime crimes and offences, without legislative authority. The inquiry in such cases is, not what power is given by the constitution to the government of the Union, but how far congress has legislated under that power; and unless the crime is brought within some act of congress, the courts of the United States have declined taking jurisdiction, where the offence was within the cognizance of state courts. [U. S. v. Bevans] 3 Wheat. [16 U. S.] 386; [U. S. v. Wiltberger] 5 Wheat. [18 U. S.] 76. This principle has not been adopted, to its full extent, with respect to the civil jurisdiction of the admiralty, and I think ought not to be. I am not, however, prepared to admit that the mere grant of the power to the Union is necessarily exclusive, and a denial of the exercise of the power by the states, until congress acts upon the subject. There are certainly very strong grounds for maintaining that, in those cases where, previous to the formation of the general government, the state tribunals possessed and were in the constant habit of exercising jurisdiction, they may continue to exercise the same where the common law affords a full and adequate remedy. But

with respect to the subject of pilotage, congress has acted, and it becomes necessary to inquire, whether in such manner as to affect the jurisdiction of the district court in this case.

The act of congress of the 17th of August, 1789, 1 Story's Laws, p. 33, § 4 [1 Stat. 54],—declares "that all pilots, in bays, inlets, rivers, harbors and ports of the United States, shall continue to be regulated in conformity with the existing laws of the states respectively wherein such pilots may be, or with such laws as the states may respectively hereafter enact for the purpose, until further legislative provisions shall be made by congress." No further provision has been made by congress, and we must look to the state law for the regulation on this subject. The act respecting pilots was passed at the same session of congress, and a few weeks previous to the judiciary act; and congress having legislated specifically on the subject, and having withdrawn it temporarily from the cognizance of the general government, so far as related to pilots in the bays, inlets, rivers, harbors and ports of the United States, it cannot, upon any sound rules of construction, be considered as impliedly embraced in the general delegation of admiralty and maritime jurisdiction to the district court. This act came under the consideration of the supreme court of the United States. in the case of Gibbons v. Ogden, 9 Wheat. [22 U. S.] 207. It had been urged at the bar, that this acknowledgment of a concurrent power in the states to regulate the conduct of pilots, was an admission of their concurrent right with congress to regulate commerce with foreign nations and among the states. The court thought this inference was not warranted. The chief justice observed: "Although congress cannot enable a state to legislate, congress may adopt the provisions of a state on any subject. When the government of the Union was brought into existence, it found a system for the regulation of pilots in full force in every state. The act which has been mentioned adopts this system. and gives it the same validity as if its provisions had been specially made by congress; but the act. it may be said. is prospective also, and the adoption of laws, to be made in future, presupposes the right in the maker to legislate on the subject. The act unquestionably manifests an intention to leave this subject entirely to the states, until congress should think proper to interpose; but the very enactment of the law indicates an opinion that it was necessary; that the existing system would not be applicable to the new state of things, unless expressly applied to it by congress. But this section of the act is confined to pilots within the bays, inlets, rivers, harbors and ports of the United States, which are, of course, in whole or in part, within the limits of some particular state. The acknowledged power of a state to regulate its police, its domestic trade, and to govern its own citizens. may enable it to legislate on this subject to a considerable extent; and the adop-

tion of the state system by congress, and the application of it to the whole subject of commerce, does not seem to the court to imply a right in the states so to apply it of their own authority; but the adoption of the state system being only temporary, until further legislative provision shall be made by congress, shows conclusively an opinion that congress could control the whole subject, and might adopt the system of the states or provide one of its own." Whatever objection there may be to the power of congress to adopt prospectively state legislation on this subject, there can be none with respect to the adoption of the then existing system.

The district court considered the libellants as having a right to sue in that court, whether they claimed compensation as salvors or as pilots. For a century past, there have been in force in the colony and state of New York, laws regulating the duty of pilots in the port of New York; these laws have undergone various revisions and re-enactments, but have continued substantially the same, so far as they relate to the questions presented in this case. There can be no doubt but from the condition in which the Wave was found, and the circumstances under which relief was afforded by the libellants, they are entitled to extra compensation for their services. But this, in my judgment, is provided for by law, and is not to be set up as a claim for salvage. These laws have at all times regulated the compensation or fees of pilots for their ordinary services, and have also provided for extra services rendered to vessels in distress. The last act on this subject was passed in the year 1819. In the nineteenth section it is enacted, "that the master, owner, or consignee of any ship or vessel appearing in distress, and in want of a pilot on the coast, shall pay unto such branch pilot or deputy pilot, who shall have exerted himself for the preservation of such ship or vessel, such sum for extra services as the said master or consignee and pilot can agree upon; and in case no such agreement can be made, the board of wardens shall determine what is a reasonable reward, and the sum so determined by them shall be paid in manner aforesaid." It has been contended that the act contemplated no other than mere pilot services by pilots, in the ordinary discharge of their duties; and reference has been made to Abbott's Treatise on Shipping for the meaning of the term "pilot." The name of pilot or steersman, says he, "is applied either to a particular officer serving on board a ship during the course of a voyage, and having the charge of the helm, and of the ship's route; or to a person taken on board at a particular place for the purpose of conducting a ship through a river road, or channel, or from or into a port." Abb. Shipp. 148. The second class of pilots is the one embracing the appellants; but a mere definition of the term can give but very imperfect information as to the duties of the officer. And this duty, so far as it is implied by the term "steersman," can

mean only the ordinary duty of a pilot; but it certainly cannot be maintained that the legislature cannot superadd to that duty any other that may be deemed fit and proper; and we must, therefore, look to the act of the legislature to ascertain the duty of pilots. And I cannot think it the true construction of this section of the act to confine it to the mere navigation of the vessel; when that is the service performed, the fees are regulated and fixed by other parts of the act. But this section provides for extraordinary services to vessels in distress, and for their preservation, and which are expressly called extra services. The degree of distress cannot change the character of the service, or discharge the obligation to render assistance; it serves to regulate the amount of compensation, but cannot convert pilots into salvors. It would be difficult to fix the point at which pilots might withdraw their services as pilots, and set themselves up as salvors; and if practicable, it would be extremely dangerous and repugnant to every sound principle of public policy to admit any such doctrine; it would be holding out strong temptations to pilots to neglect their duty, under the hope and expectation of receiving a greater compensation by way of salvage. Ample provision is made to compensate them for such extra services. The board of wardens is always composed of men peculiarly fitted and qualified to judge of such services. The plain and obvious light, as it seems to me, in which this act views pilots is, that their ordinary duty is to navigate the vessel, and for this one rule of compensation is given. Their extraordinary duty is to assist vessels in distress, and for this another rule of compensation is provided.

If we look through these laws regulating pilots from the earliest period, we find it made a part of their official duty to assist vessels in distress. The neglect or refusal has sometimes been declared a forfeiture of office, sometimes punished by fine. The act of 1775, I believe, is the first which provides for compensation for extra services. Should any objection be supposed to lie against the act of congress adopting prospectively the state regulation on this subject, it cannot affect the present case. There can certainly be no objection to adopting the then existing system; and the act of 1784, which was the law in force in New York when the act of congress was passed, contains substantially the same provision, accompanied with a recital that the provision is made for the encouragement of pilots who shall distinguish themselves by their activity and readiness to aid and assist vessels appearing in distress; and it declares that this extra compensation shall be collected in the same manner as directed by the act for the collection of pilotage, which was before the mayor, or recorder, or alderman, of New York, in a summary manner. By some of these laws, jurisdiction is given, in general terms, to any court having cognizance thereof. If this subject, as is said in the Case of Gibbons and Ogden, has been entirely left to the

superintendence of the states, it cannot, I think, be maintained that the execution of these laws is to be enforced in the courts of the United States; the whole subject must include the remedy. In the case referred to, these laws are classed with the health laws of the states, and those which permit a tonnage duty to be levied for the use of their ports, and many other subjects which, under the powers of the general government, might be withdrawn from the states, but which have been left to their superintendence. 9 Wheat. [22 U. S.] 238.

Giving to the district court jurisdiction of this case as a case of pilotage, would necessarily extend that jurisdiction to all claims for fees for ordinary services. The district court has treated this as a claim for salvage, but at the same time declaring that the libellants could sue in that court for compensation as pilots. It does not become necessary for me, according to my view of this case, to enter into a particular examination of the circumstances under which the libellants afforded assistance and relief to the schooner. Their services were undoubtedly very beneficial, and contributed much to the preservation of the vessel and cargo, and entitles them to a liberal compensation; [4] still, they were only acting in the discharge of their duty imposed upon them by law, and not as mere volunteers. The supreme court of this state in the case of Callagan v. Hallett, 1 Caines, 105, in commenting upon the law of the state relating to pilots, says it makes it the duty of pilots to give all the aid and assistance in their power to any vessel appearing in distress on the coast, and neglect or refusal subjects them to forfeiture of their places.

I do not enter into the merit or extent of the services rendered by the libellants, because I hold that whatever they may have been, these pilots cannot claim compensation as salvors. That admitting cases may exist where pilots, for services upon the high seas, where their duty is prescribed, and to be determined by the general principles of the maritime law, may, in very extraordinary cases, become salvors and claim as such; yet, in the present case. where their duty is prescribed by statute, which, according to my understanding of it, requires of them to render all the aid and assistance in their power to vessels in distress, under all circumstances, they cannot abandon their duty as pilots and become salvors. It may, I believe, be laid down as a rule admitting of no ex-

ception, that where the service performed is required by law as a duty, it cannot be set up as a salvage service. I am, accordingly, of opinion that the decree of the district court must be reversed without costs.

NOTE. A pilot, while acting in the strict line of his duty, however he may entitle himself to extraordinary pilotage compensation for extraordinary services, as contradistinguished from ordinary pilotage for ordinary services, cannot be entitled to claim salvage. In this respect he is not distinguished from any other officer, public or private, acting within the appropriate sphere of his duty. But a pilot, as such, is not disabled, in virtue of his office, from becoming a salvor. On the contrary, whenever he performs salvage services beyond the line of his appropriate duties, or under circumstances, to which those duties do not justly attach, he stands in the same relation to the property as any other salvor; that is, with a title to compensation to the extent of the merit of his services, viewed in the light of a liberal public policy. Sir William Scott, in the case of The Joseph Harvey, 1 C. Rob. Adm. 306, speaking upon this subject. where pilots were claiming as salvors, said, "This is a petition praying salvage; and it is said by his majesty's advocate, that it is impossible for these persons to claim salvage, as there is little more than pilotage due; although it is allowed that the court may, in cases of pilotage, as well as of salvage, direct a proper remuneration to be made. It may be, in an extraordinary case, difficult to distinguish a case of pilotage from a case of salvage, properly so called; for it is possible, that the safe conduct of a ship, under circumstances of extreme personal danger and personal exertion, may exalt a pilotage service into something of a salvage service. But, in general, they are distinguishable enough; and the pilot, though he contributes to the safety of a ship, is not to claim as a legal salvor." From this language, it is obvious that the learned judge had in his mind the distinction between extraordinary pilotage services and salvage services, properly so called; the one clearly going beyond the mere line of duty, and the other going merely to the extreme line of duty. In the case of The Aquila, 1 C. Rob. Adm. 37, where a magistrate, acting in discharge of his public duty, demanded to be considered as a salvor, the same learned judge said: "This, however, is certain, that if a magistrate, acting in his public duty, on such an occasion, should go beyond the limits of his official duty in giving extraordinary assistance. he would have an undeniable right to be considered as a salvor." The same principle was fully recognized by Mr. Justice Washington. in the case of Le Tigre [Case No. 8,281]. in which, after stating that ordinary official duties were not to be compensated by salvage, he added: "Of this class of cases is that of a pilot. who safely conducts into port a vessel in distress at sea. He acts in the performance of his ordinary duty. imposed upon him by the law and nature of his employment; and he is, therefore, not entitled to salvage, unless in a case. where he goes beyond the ordinary duties attached to his employment." Mr. Justice Thompson. in the case of The Wave, maintains the same doctrine. upon an elaborate review of all the cases. It has been also applied to another very meritorious class of cases, we mean that of seamen. who, in the ordinary course of things, in the performance of their duties, are not allowed to become salvors. whatever may have been the perils or hardships or gallantry of their services in saving the ship and cargo. We say in the ordinary course of things: for extraordinary events may occur in which their connection with the ship may be dissolved de facto, or by operation of law, or they may exceed their proper duty, in which cases they may be permitted

---

[4] The act for the regulation of pilots and pilotage for the port of New York (Sess. 7, c. 31, §§ 2, 3) makes it the duty of pilots to give all the aid and assistance in their power to any vessel appearing in distress on the coast, and for neglect or refusal subjects them to a fine or forfeiture of their places; but for the encouragement of such pilots who shall distinguish themselves by their activity and readiness to aid vessels in distress, it enacts, that the master or owner of such vessel shall pay to such pilot who shall have exerted himself for the preservation of such vessel, such sum for extra services as the master or owner and such pilot can agree upon; and in case no such agreement can be made, the master and wardens of the port are empowered to ascertain the reasonable reward.

to claim as salvors. Such was the case of the seamen left on board in the case of The Blaireau, 2 Cranch [6 U. S.] 268; and such was the exception alluded to in the case of The Neptune, 1 Hagg. Adm. 226, 237. See 3 Kent, Comm. and lect. 47, p. 199 (1st Ed.); The Two Catherines [Case No. 14,288]; Newman v. Walters, 3 Bos. & P. 612. In this last case, Lord Stowell, after saying that the crew of a ship cannot be considered as salvors, gave what he deemed the definition of a salvor: "What," said he, "is a salvor? A person who, without any particular relation to a ship in distress, proffers useful services, and gives it as a volunteer adventurer without any pre-existing covenant. that connected him with the duty of employing himself for the preservation of that ship." And it must be admitted, that, however harsh the rule may seem to be in its actual application to particular cases, it is well founded in public policy, and strikes at the root of those temptations which might otherwise exist to an alarming extent. to seduce pilots and others to abandon their proper duty, that they might profit by the distresses of the ship, which they are bound to navigate. Lord Tenterden, in his excellent Treatise on Shipping (part 2, p. 148, c. 5, § 1), has defined a pilot to be "a person, taken on board at a particular place, for the purpose of conducting a ship through a river, road or channel, or from or into a port." His duty, therefore. is properly the duty to navigate the ship over and through his pilotage limits, or, as it is commonly called, his pilotage ground. The case. therefore, necessarily presupposes, that the ship is in a condition capable of being navigated; distressed, if you please, and laboring under difficulties, but still capable, in point of crew, equipments and situation, of being navigated. No one ever heard of its being within the scope of the positive duties of a pilot to go to the rescue of a wrecked vessel, and employ himself in saving her or her cargo, when she was wholly unnavigable. That is a duty entirely distinct in its nature. and no more belonging to a pilot than it would be to supply such a vessel with masts or sails, or to employ lighters to discharge her cargo, in order to float her. It is properly a salvage service, involving duties and responsibilities, for which his employment may peculiarly fit him; but yet in no sense included in the duty of navigating the ship. Lord Alvanley, in Newman v. Walters, 3 Bos. & P. 616, puts a case far short of that, which is here presented, as a clear case of salvage. "Suppose," said he, "a tempest should arise. while the pilot is on board, and he should go off in a boat to the shore to fetch hands, and should risk his life for the safety of the ship in a manner different from that which his duty required: in such a case, it seems to me that he would be entitled to a compensation in the nature of salvage; and I am glad that Sir William Scott appears to entertain the same opinion."