## THE C. P. MINCH.

(District Court, N. D. New York. May 17, 1894.)

SALVAGE—WHAT ARE SALVAGE SERVICES.

A vessel anchored near shore on a dark, squally night, in a heavy sea, swung round towards the shore, and her bow began pounding on a sand bar. The master went ashore with part of the crew, found a tug, and sent her out next morning. After he left, the mate and remaining seamen took soundings, found deeper water towards the stern, and let out the anchor chain until the vessel was in deep water, where she rode quietly until morning. The voyage was thereafter completed, and the crew received their wages. *Held* that, even if the master intended to abandon the ship, those who remained were not entitled to salvage, for the danger was not extreme, and their services were but the ordinary services of skillful seamen. The Blaireau, 2 Cranch, 240, The Umattilla, 29 Fed. 252, and The Triumph, Fed. Cas. No. 14,183, 1 Spr. 428, distinguished.

This was a libel against the schooner C. P. Minch, filed by certain of her crew to recover salvage.

George S. Potter, for libelants.
George Clinton, for claimants.

COXE, District Judge. On the 19th of September, 1893, the three-masted schooner C. P. Minch, having a cargo of about 639 tons of stone, set sail from Portage Entries, a port on Lake Superior, destined for Buffalo. Her crew consisted of a master, mate, cook and four seamen. There were also on board two passengers. On the afternoon of the 21st she reached Whitefish Point. The wind was blowing strong from the southeast and it was difficult if not impossible to round the point in the face of the heavy sea and strong head wind. In these circumstances she dropped anchor under the lee of the point about a mile from land in four and one-half fathoms of water. The schooner drew 13 feet. About midnight the wind died down, the glass fell and everything indicated a coming storm. Shortly afterwards the wind veered around and blew hard from W. N. W. A heavy sea was running. It was a rainy, dark and squally night. The vessel swung around towards the shore and her bow commenced pounding on a bar of sand and gravel. The captain then told the crew to get ready and go ashore in the yawl. The libelants, the cook and the two passengers remained on board. The captain and three men succeeded in landing in safety. Shortly after the captain departed, the libelant Talbert, who was the mate, after sounding and discovering that there was deeper water amidships and at the vessel's stern, let out more anchor chain and she went over the bar in 22 feet of water and there lay quietly until the morning. The wind grew lighter about 3 o'clock and fell gradually until daylight. During the afternoon two fishing tugs were anchored near the point. On landing the captain went in search of these tugs and was informed that they were then on the other side of the point. He thereupon procured a lantern and went through the woods to obtain the assistance of one of them for the schooner and crew. The master of the tug declined to go out until

daylight, but did, in fact, start about 5:30 a. m., just as day was breaking. After some maneuvering the tug made fast to the schooner and with the assistance of the latter's sails pulled her into the lake. The schooner then set sail, rounded the point and proceeded on her journey to Buffalo. The captain and the three men who had gone ashore followed the schooner in the tug and after signaling her twice the schooner hove to and they were taken aboard, the master assuming command. On reaching Buffalo all the crew, including the libelants, received their wages.

The libelants concede the general rule that mariners cannot libel their own vessel for salvage. It is, however, contended that these libelants are within the exception recognized by The Blaireau, 2 Cranch, 240; The Umattilla, 29 Fed. 252; and the Triumph, 1 Spr. 428, Fed. Cas. No. 14,183. In each of the cases cited there was no doubt regarding the following propositions: First. The vessel was seriously injured and in imminent peril. Second. The master and crew had deserted her. Third. The voyage was actually broken up and no wages were received. Fourth. The libelants' services were of the most meritorious character. They braved great dangers, suffered the severest hardships and saved or contributed to save the ship from destruction.

In the case at bar, on the contrary, there is the gravest doubt upon each of these propositions. The Minch was in no sense a wreck; she had received no injury; she was not leaking to any appreciable extent; she had lost no part of her tackle and when the master left her she was as staunch and strong as at any time during the voyage. There was absolutely no reason for abandoning her sine spe revertendi. The shifting of the wind placed her in a dangerous situation, that was all. If the wind had increased and if the anchor had failed to hold she might have been stranded. The situation was critical but not desperate. It demanded men of ordinary honesty, skill and bravery. It is true that the schooner was pounding on the bar of sand and gravel, but this difficulty was quickly relieved by the libelants. It required nothing but ordinary seamanship to use the lead, and, having ascertained the depth of the water, to relieve the vessel by shortening or lengthening the anchor chain as the circumstances required. Any seaman would expect to render such services as part of his vocation. After reading the testimony I am convinced that it required fully as much courage to embark in the master's yawl and attempt to make a landing through the breakers as to remain on the schooner.

Very little is said in either brief as to the action of the two passengers, but to my mind their conduct is very persuasive upon this question. They were under no obligation to the vessel. They had nothing but their own safety to consult. They could go or stay as they pleased, and yet they deliberately preferred to remain. That there was no real danger at the time the master left the schooner is sufficiently proved by the libelant Talbert. He testified:

"Q. I suppose you were very much frightened when the captain left the vessel? A. No, sir; I was not. Q. Why not? A. Because I thought she

could be saved; if a man worked her right she could get off. Q. My question was why you were not frightened. A. Because there was nothing to be frightened at."

To find on these facts that the captain left intending to abandon the vessel is to convict him of lunacy or barratry.

There is testimony of language used by the master and some acts of his which tend to support the theory of the libelants, but taking into consideration the entire testimony and particularly his action with reference to the tug I am compelled to think that it was his purpose to save the schooner if possible. Assuming him to be a man of ordinary honesty and common sense it is simply incredible that he intended to abandon her because she was in a position of danger. But even upon the assumption that the master abandoned her, either because he was panic-stricken or deliberately and willfully intended to wreck her, his conduct did not absolve the libelants from their duty to the vessel. The services which they rendered were the ordinary services of skillful seamen. The vessel had a right to them by virtue of the existing contract. Rev. St. U. S. § 4525. It would, in my judgment, be a most dangerous precedent to hold that a seaman is entitled to salvage each time he extricates his vessel from an awkward or hazardous situation. That these libelants did anything more than was required of them by the situation I cannot believe. Their wages have been paid in full and they have no claim for anything further. The Neptune, 1 Hagg. Adm. 227, 237; Miller v. Kelly, 1 Abb. Adm. 564, Fed. Cas. No. 9,577; The Dodge Healy, 4 Wash. C. C. 651, Fed. Cas. No. 2,849; The Franklin, Blatchf. & H. 525, 543, Fed. Cas. No. 11,646; The John Perkins, 21 Law. Rep. 87, Fed. Cas. No. 7,360; The Wave, 2 Paine, 131, Fed. Cas. No. 17,300; 2 Pars. Shipp. & Adm. 264; Cohen, Adm. 55, 56.

The libel is dismissed.