## Case No. 7,360.

### The JOHN PERKINS.

[21 Law Rep. 87.]

Circuit Court, D. Massachusetts. May, 1857.[1]

C. G. Thomas, for libellant.
W. G. Russell, for claimant.

CURTIS, Circuit Justice. This is an appeal from a decree of the district court in a cause of salvage. The libel was filed by Nickerson, one of the crew of a fishing schooner called the Wyvern for himself, and by Thomas Lewis, master of the Wyvern, in behalf of the owners, officers, and crew of that vessel. It appears from the pleadings and proofs that during the severely cold weather of the month of February, 1856, the John Perkins, the Wyvern, and two other vessels were accidentally enclosed in a large field of ice, which extended along the shores of Massachusetts Bay, and continued to make until their immediate escape became impossible. Though the vessels were embedded, the field of ice was moved by the wind and sea. In this condition these vessels remained for several days, drifting helplessly with the field of ice, which was constantly becoming thicker and more dangerous by the piling of masses on each other, which the intense cold at once rendered solid. The crews became alarmed for their own safety. On Saturday, the 11th of February, the crew of the Wyvern, with the exception of Nickerson, the libellant, left her and went on shore over the ice. Nickerson thought this attempt more dangerous to him than it was to remain on board, and he therefore remained. About noon of Sunday, the 19th, the crew of the John Perkins left her and went first on board the Acorn, a steamer which was one of the vessels enclosed, and during the afternoon went on shore, together with the crews of the two other vessels, deeming it too hazardous to life to remain. The wind was blowing a gale, and there can be no doubt that the condition of all the vessels was one of extreme peril.

The libel pleads that at about half-past eleven o'clock of the night of Sunday, Nickerson discovered the John Perkins drifting directly towards the Wyvern, which had one anchor down; that to prevent a collision and the destruction of both vessels, Nickerson cut the cable of the Wyvern, and thus prevented the destruction of both vessels. And it is for this act salvage is claimed. There is very great conflict in the testimony respecting the danger of a collision between the John Perkins and the Wyvern. But I do not deem it necessary to pronounce

any opinion upon it; for I think the act alleged to have been done, did not amount to a salvage service rendered to the John Perkins.

I cannot distinguish this case from that of Beane v. The Mayurka [Case No. 1,175], decided by this court in 1854. In that case two vessels were at anchor inside the breakwater in Delaware Bay. In a gale of wind the Mayurka drifted, dragging her anchors, and came in collision with the Sarah Adeline, whose master, to avoid the destruction of both, slipped her cable, tried to hold on with her small anchor and kedge, but went ashore. It was held that as the two vessels were subject to a common peril which threatened the immediate destruction of both; and, as the master of the Sarah Adeline found he could not otherwise release his vessel, it was his imperative duty to slip his cable to save his own vessel and the lives of the crew; that this could not be deemed such a voluntary interposition to save the property of another, by one under no legal obligation to interpose, as to constitute a claim for salvage. I am satisfied of the correctness of that decision. As was observed by Sir John Nichol in The Calypso, 2 Hagg. Adm. 217, both civil and military salvage resolve themselves into the equity of rewarding spontaneous services rendered in the protection of the lives and property of others. However others may incidentally profit by an act, if it was done not for the purpose of benefitting others, but to save property under the charge and protection of the actor, he was legally bound by his contract to do all which was done for the preservation of the property under his charge, and it cannot be treated by a court of admiralty as a spontaneous service, and cannot found a claim to a salvage compensation. When vessels are entangled by a collision, it is not unfrequently necessary, voluntarily, to destroy parts of their rigging, or spars, or both, to enable them to separate. Such damages receive their character from the character of the collision, and are apportioned, or paid for by the wrong doer, or borne by the party on whom they fall, according to the existence or absence of fault. Such sacrifices do not constitute a claim for salvage, though the acts done may sometimes involve personal danger, and may relieve both vessels from otherwise certain destruction. And I can perceive no sufficient reason why sacrifices necessarily made to avoid a collision, should not fall within the same rule. But it is insisted that the libellant stood on such a relation to the Wyvern that he could be a salvor of that vessel as well as of the John Perkins; and that having rendered assistance whereby both vessels were relieved from peril, he may well be considered the salvor of each. This position requires examination; for if a mere stranger, under no duty by contract or otherwise, renders assistance upon the sea, by means of which two vessels are prevented from destroying each other, no reason is perceived why he may not claim a salvage compensation from each. In this case, Nickerson was one of the crew of the Wyvern. It is laid down by numerous authorities, and is undoubtedly a part of our maritime law, that seamen are bound by their contract to exert themselves to the utmost to save the vessel and cargo from peril. Abb. Shipp. (6th Am. Ed.) p. 751, pt. 5, c. 2, § 2; The Two Catherines [Case No. 14,288]; Pitman v. Hooper [Id. 11,185]; The Dawn [Id. 3,666]; The Massasoit [Id. 9,260]; Mesner v. The Suffolk Bank [Id. 9,493]. And while that contract subsists and is operative, services rendered by them in saving another vessel, or cargo, or both, being due by force of their contract, will not enable them to claim as salvors. In the case of The Neptune, 1 Hagg. Adm. 236, Lord Stowell said: "The doctrine of this court is justly stated by Mr. Holt—that the crew of a ship cannot be considered as salvors. What is a salvor? A person who without any particular relation to a ship in distress, proffers useful service, and gives it as a volunteer adventurer, without any preexisting covenant that connected him with the duty of employing himself for the preservation of that ship: not so the crew, whose stipulated duty it is, (to be compensated by payment of wages,) to protect that ship through all perils, and whose entire possible service for this purpose is pledged to that extent." In Hobart v. Drogan, 10 Pet. [35 U. S.] 122, Mr. Justice Story in delivering the opinion of the supreme court, after saying it is laid down by Lord Stowell, that the crew of a ship cannot be considered salvors, quotes the above definition of a salvor, and uses the following language, "And it must be admitted, that, however harsh the rule may seem to be in its actual application to particular cases, it is well founded in public policy, and strikes at the root of those temptations which might otherwise exist to an alarming extent, to induce pilots and others to abandon their proper duty, that they might profit by the distress of the ship which they were bound to navigate." This definition of Lord Stowell in the case of The Neptune, and its consequence that seamen cannot be salvors of their own vessel, had previously received the sanction of Mr. Justice Thompson, in the case of The Wave [Case No. 17,300], in an elaborate opinion, not reported when Hobart v. Drogan [supra] was decided.

It is true there is a class of cases in which seamen have been considered entitled, in case of shipwreck, to recover their wages out of the proceeds of the wreck saved by them; and in some cases, where the disaster occurred in a foreign country, an additional amount to pay the expense of their return home. See The Dawn [supra], where the authorities are elaborately examined. And

in some of these cases it was considered that this claim of the seamen was in the nature of a claim for salvage. Mr. Justice Story so considered in the case of The Two Catherines [Case No. 14,288]. In his note to Abb. Shipp. pt. 5, p. 753, c. 2, § 2, he says: "Lord Stowell, in the case of The Neptune, 1 Hagg. Adm. 227, puts the case of shipwreck as an exception to the rule, as to the earning of freight being a preliminary to the payment of wages, and so it was intimated in The Two Catherines [supra], the doctrine ought to be; but the court then thought the rule upon the authorities had not been construed as liable to such an exception, and therefore put the allowance of wages in case of shipwreck upon grounds of a qualified salvage." I infer from this passage, as well as from what he said in Hobart v. Drogan, and Pitman v. Hooper [supra], that if the case of The Neptune had been before him, when he decided the case of The Two Catherines, he would have placed that decision upon the same exception asserted by Lord Stowell, and not upon a claim to a qualified salvage. More recently, Judge Sprague in the district court for the district of Massachusetts, after a careful examination of the authorities, has held that wages, as such, by operation of the contract, and not by way of salvage, are recoverable in cases of shipwreck, if the crew either assisted or were ready to assist in saving the vessel. The Massasoit [Case No. 9,260].

It being perfectly settled that the seamen are entitled to recover in such a case, and also that the quantum of their claim is fixed by the amount of wages due, adding perhaps the expense of their return, it does not appear to me intrinsically important, whether such an allowance is denominated a quasi salvage compensation, or held recoverable solely under the contract. If salvage, it is so qualified that its compensation is limited to the specific allowance growing out of, and due under the contract, as that is interpreted by the maritime law, and the right to such allowance does not change or trench upon the settled rule that a seaman acting under a subsisting contract has no standing in a court of admiralty as a salvor of his own vessel. Undoubtedly, when the contract ceases to be binding on the seaman, even if the voyage has not been completed, he may then become a salvor. Such was the case of Mason v. The Blaireau. 2 Cranch [6 U. S.] 268. And, as was said by Lord Stowell, in The Neptune, and is repeated in Hobart v. Drogan [supra], it may be possible that a seaman may render a service exceeding the duty which he owes by his contract and become a salvor. But so far as I know, no such case has ever been presented to a court in England or in this country. The case of Mesner v. The Suffolk Bank [Case No. 9,493], decided by Judge Davis, in this district, in 1838. would seem to have involved all the considerations in favor of the claim of one of the ship's company to be a salvor, which could well be presented. The steamer New England bound from Boston to ports in the state of Maine, came in collision with a sailing vessel in the night time; a large hole was made in the bow of the steamer, which immediately began to fill. The passengers and crew took refuge on board the sailing vessel, which was not seriously injured. The master and some of the crew of the steamer got one of its boats and lay by in it, at a prudent distance. In this state of things, and while the steamer was rapidly filling with water, the libellant, who was the engineer of the steamer, took an axe, boarded the steamer, cut a hole in the promenade deck over the captain's office, and by great personal exertion rescued a package of bank bills, amounting to the sum of $46,000, which belonged to the defendants, and restored them to the custody of the defendants' agent, who was a passenger on board. The libellant acted, not on any order of the master, but upon an offer of a liberal reward made by the agent, whose authority to make the offer the defendants denied. And when he finally left the steamer, the water was already over the guards, and she sunk within a few minutes. I was of counsel for the libellant, and pressed the points, that it was admitted contingencies might occur, in which one of the ship's company could be a salvor; that in this case the property saved had been abandoned by the officers and crew of the steamer, and without the gallant and successful effort of the libellant, must have immediately perished; that the libellant being the engineer of the steamer had no duty to perform save to manage and take care of the machinery of the boat; that his duties under his contract terminated when the steamer was finally abandoned as unnavigable; and that what he did was beyond the line of his duty and entitled him to claim as a salvor. But Judge Davis, whose experience in the administration of the maritime law, as well as the soundness of his judgment and his careful research, will cause his decisions to be long remembered here with respect, and whose inclinations to uphold the rights of seamen, with a strong hand, were never doubtful, dismissed the libel. I advised an appeal; for I was desirous of obtaining the opinion of my eminent predecessor, whose views in the case of The Two Catherines had been strongly pressed on Judge Davis; but my client was not willing to appeal. Though I am not prepared to deny that cases may arise in which the crew may become salvors of the vessel, it is not easy for me to foresee how such a case can arise, while their contract continues in force. The degree of distress certainly does not change the character of the service; and if the amount of personal exertion and hazard, incurred in preserving the property, can change the character of the service, what becomes of the rule of the

maritime law, under which, as Lord Stowell says, "it is the stipulated duty of the crew, (to be compensated by payment of wages,) to protect that ship through all perils, and whose entire possible service for this purpose is pledged to that extent," and how, as Mr. Justice Thompson asks in the case of The Wave [Case No. 17,300], can we fix the point at which seamen may withdraw their services as seamen, under their contract, and set themselves up as salvors. No doubt a seaman must sometimes judge for himself, whether he will or will not do an act to save life or property. The peril may possibly be so great, as to justify his refusal, even if ordered by the master to do it. But however great it may be, if he choose to encounter it to guard the vessel from destruction, he must be deemed to be acting under his contract, and in the gallant discharge of his duty. and not as a salvor.

I come now to the application of these principles to the facts of this case. The libellant voluntarily remained on board the Wyvern when the rest of the ship's company went on shore. simply, as he admits, because he considered it more dangerous for him to go, than to remain. Though the master and crew of the Wyvern temporarily left the vessel under the pressure of the danger arising from the force of the wind, it was their intention to return on board when the gale should have abated; and though they undoubtedly considered the danger imminent, there is no reason to say, upon the evidence, they thought the condition of the vessel hopeless. They not only intended to return, but expected to return. And they at no time were far enough distant to lose sight of the vessel in the day time, or to be unable to return promptly, when the gale should abate. This was, therefore, not a case of a derelict vessel, nor were those of the crew who went on shore, or the libellant who remained on board, absolved from their duties as seamen; the latter to do any thing which he might find practicable for the safety of the vessel while he remained on board. and the former to return on board and continue their voyage, when circumstances should permit and the master require them to do so. Clarke v. The Dodge Healy [Case No. 2,849]; The Emulous [Id. 4,480]; Lewis v. The Elizabeth and Jane [Id. 8,321]; The Aquila. 1 C. Rob. Adm. 39. I can see no ground for saying his relation to the vessel was dissolved, or the duties growing out of that relation terminated; nor was it so considered in the court below. It is not pleaded in the libel nor shown by the proofs that he was in any way absolved from the obligation which he was under as one of the crew of the Wyvern, to cut her cable when he found that was the only means of preserving her from destruction. I cannot treat him therefore as a stranger to both vessels and capable of rendering a salvage service to both; but only as one of the crew of the Wyvern, voluntarily on

board, and bound by his contract to act, as he did act, for the preservation of the vessel under his charge. And his claim for salvage must be rejected.

Without intending to express any opinion upon the questions, whether the libellant did in fact render the service alleged, or whether there was danger of a collision, such as is alleged, it is not unimportant to remark that the proof of the asserted service, and of its necessity, is derived solely from the libellant himself, and that there is no small difficulty, upon the proofs, in determining whether his statements on these essential points are true. When strangers interpose to save property, if it is derelict, there can hardly be a case in which it is doubtful whether a salvage service has been performed; if still in the custody of the ship's company, or some of them, they may be relied on as disinterested witnesses to describe the material facts. But if the crew, or individuals of them, may become salvors, the owners, as in this case, may have no protection, arising from the presence of those to whose charge they committed their property, since these are the very persons setting up the hostile claim, and, in the absence of all other evidence, proving, by their own testimony. the necessity for, and the rendition of the service. The temptations which may arise from such exposure, may afford an additional proof of the wisdom of the rule, that the crew of a vessel cannot be its salvors. But it is further insisted on behalf of the owners of the Wyvern, that the John Perkins was in fault for drifting towards the Wyvern and rendering it necessary to cut her cable, and so there is a valid claim for damages in the loss of the cable and anchor.

Upon the evidence before me, I should find it difficult to come to the conclusion that, if the crew of the John Perkins had remained on board, they could have prevented that vessel from drifting, save by letting go their anchors and thus subjecting their vessel to the imminent hazard. not to say the certainty of being destroyed by the moving field of ice. But if this were not so. I should still be unable to say that the absence of the crew was any fault on their part. They left for the shore to save their lives from imminent danger, and were justified in doing so. And I do not think their vessel can be treated as guilty of a tort. when its navigators were in no wrong. The same vis major which drove them from the vessel. caused her to drift; and if their presence could have prevented its drifting, the vis major which deprived the vessel of their presence is as much the proximate and efficient cause of the drifting as it would have been if that vis major had deprived the Wyvern of her anchors. Both men and anchors are necessary to prevent a vessel from drifting. If a vessel parts her cables in a storm and consequently drifts into collision with another vessel, it is a misfortune without fault, and each bears

its own loss. Steinbank v. Rae, 17 How. [58 U. S.] 532. If the officers and crew of a vessel are washed overboard, or properly leave a vessel to save their lives, so that the anchors cannot be used, I think the same law applies to a subsequent collision. It is true there are many cases in which the vessel is treated as the offending thing, and is charged or forfeited irrespective of the conduct or intentions of those who own her. The Malek Adhel, 2 How. [43 U. S.] 233; The Porpoise [Case No. 11,284]. But this is for illegal or negligent uses of the vessel, by the officers and crew or some of them, and is resorted to from motives of public policy to suppress an offence or wrong, or to afford an indemnity to an injured party. I am not aware of any case where the vessel has been so treated, when neither its owners, or navigators, were chargeable with any fault. The claim for damages must therefore be dismissed.

. It is further suggested that there may be a claim for a general average contribution for the loss of the cable and anchor. When the case of Beane v. The Mayurka [Case No. 1,175]. was decided, I understood the law, as settled by the supreme court, to be, that the admiralty had not jurisdiction of such a claim. But at the last term of the supreme court this subject has been carefully examined (Dupont v. Vance, 19 How. [60· U. S.] 162), and it is now settled, that the owner of cargo jettisoned has a maritime lien on the vessel to secure the payment of the contributory share due from the vessel, and that this lien may be enforced by a libel in rem in the admiralty. But the question here is whether a voluntary sacrifice made by one vessel to avoid or escape an apprehended collision with another vessel, makes a case for contribution in general average. It is certainly true that such a claim, when viewed theoretically, has an equity very similar to, if not identical with, that on which the famous Rhodian law was founded, and out of which the more modern doctrines of the law of general average have grown. "Omnium contributione sarciatur quod pro omnibus datum est." Poth. Pan. 14, 2, 1. "Equissimum enim est, commune detrimentum fieri eorum qui propter amissas res aliorum, consecuti sunt ut merces suas salvas habuer unt." Id. 14, 2, 6. ·At the same time it is quite clear that the Roman law never applied the principle between mere strangers. The Digest (9, 2, 29, 3) says: "Labeo scribit. si cum vi ventorum navis impulsa esset in funes anchorarum alterius, et nautae funes praecidissent, si nullo alio modo, nisi praecisis funibus, explicare se potuit, nullam actionem dandam."

This is the precise case under consideration, except that the cable is cut by the mariners of the other vessel, which can scarcely weaken the claim. Emerigon cites this as good law and refers to the laws of Oleron and Wisbuy as containing a similar rule as to the removal of an anchor. 1 Emerig. Ins. p. 416, c. 12, § 14. And at the common law, there are cases of urgent necessity in which one whose property is destroyed, has no action—as pulling down a house to prevent the spread of a fire, as was resolved in 12 Coke, 13, 63. See, also, Vin. Abr. "Necessity," pl. 8; 4 Term R. 797; [Respublica v. Sparhawk] 1 Dall. [1 U. S.] 363; 17 Wend. 290; 2 Denio, 461. But whether an action would or would not lie, where the mariners of one vessel can escape only by cutting the cable of another vessel, and do so, the question here is whether the law of general average extends to a case where the cable of a vessel is cut by its crew to prevent an apprehended collision with another vessel. I am not aware that the right of contribution has ever been extended beyond those who voluntarily embarked in a common adventure. Very eminent writers upon maritime law have considered that the right grows out of, and depends upon a contract implied by the law from the relation created by the contract of affreightment. Such is the opinion of Pothier, Traité des Contrats de Louages Mar. pt. 2, art. Prelim., of Pardessus, Droit Com. pt. 3, tit. 4, c. 4, § 2. Chief Justice Parsons declares in Whitteridge v. Norris, 6 Mass. 131, that the requisites to a case of general average, are, a contract, by which distinct properties of several persons become exposed to a common peril, and a relief from that peril at the expense of one or more of the concerned, who thereupon are entitled to a contribution from the rest. And in the case of Dupont v. Vance, 19 How. [60 U. S.] 162, as well as in Lawrence v. Minturn, 17 How. [58 U. S.] 109, 110, it will be found that the supreme court considered that the master, in· case of necessary voluntary sacrifice to escape peril, was acting as the authorized agent of all concerned in the common adventure, and so bound all by his act, a principle which could hardly apply between mere strangers. I have on a former occasion declared that I did not consider the right to recover a general average contribution arises from a contract,—Sturgis v. Cary [Case No. 13,573],—but from a principle of natural justice, that they who have received a common benefit from a sacrifice voluntarily made by one engaged in a common adventure, should unite to make good the loss which that sacrifice occasioned. But I never entertained a ·doubt, that from the relation of the parties to a common adventure, the law would imply a contract for the purpose of a remedy; nor did I then· suppose that it would be implied between strangers, who were not united in a common adventure by one or more contracts of affreightment. The ancient as well as the modern codes of sea laws proceed upon the assumption that the master, representing all the aggregate interests by holding that office. has the rightful power to judge upon the

sacrifice of one of the interests which he thus represents, for the benefit of the others. But they afford no ground for the position that he may judge and act for mere strangers, whose property has not been confided to his care. In my opinion the only subjects bound to make contribution are those which are united together in a common adventure and placed under the charge of the master of the vessel, with the authority to act in emergencies as the agent of all concerned, and which are relieved from a common peril by a voluntary sacrifice made of one of those subjects. Consequently, I must reject the claim for general average. The decree of the district court must be reversed; but the questions are so novel, and attended with so much difficulty, and the equitable considerations in favor of some of the claims are such, that I do not think it fit to charge the appellees with costs.