## Case No. 11,999.

ROFF et al. v. WASS et al.

[2 Sawy. 389.][1]

District Court, D. Oregon. April 20, 1873.[2]

SALVAGE — TUGBOAT — WHO ENTITLED TO SHARE.

1. The pilot act of Oregon (Sess. Laws 1868, p. 23) provides that the steam tug and pilot-boat at the mouth of the Columbia river shall tow and pilot sail vessels "upon the pilot grounds between Astoria and the open sea, outside the bar," "in all weather," when the bar "can be crossed by first-class steamers and sail vessels," for a uniform compensation in proportion to the draught of the vessel, called pilot fees: Held, that so long as it is reasonably safe to take a vessel in tow anywhere on this pilot ground, the tug is bound to do so, and is not entitled to compensation therefor as a salvor, but that she is not bound to incur extraordinary risk to tow a vessel, or to rescue it from danger of wreck, and when she does so, she is entitled to compensation therefor, as a salvor.

[Cited in The James P. Donaldson, 19 Fed. 272.]

2. Where the master and owners of the steam tug Astoria received the sum of $5,000 from a vessel and her cargo, for rescuing them from danger of wreck and loss below Sand Island, they are accountable to the crew of the former as salvors for their shares of such sum.

3. Semble, that the receipt of said sum of $5,000 by said master and owners, as extra compensation for extraordinary services and risk, is an admission that the service was a salvage one, and not mere towage, and as against the crew, they are estopped to deny it.

[Cited in McMullin v. Blackburn, 59 Fed. 179.]

In admiralty.

John H. Woodward and Erasmus D. Shattuck, for libellants.
W. W. Page, for respondents.

DEADY, District Judge. This suit is brought by the libellants—R. Cyrus Shively, Neal Devine, Charles Young and Eliza Roff, administratrix of William Roff—to recover their shares of the sum of $5,000, paid to the respondents—A. D. Wass, George Flavel, A. Cole Farnsworth, A. M. Simpson, and Henry S. Aikin and Franklin Nickerson, administrators of Alfred Crosby—for salvage service performed by them and libellants in rescuing the barkentine Jane A. Falkinburg from great peril near the mouth of the Columbia river.

Substantially the libel alleges that on January 13, 1872, the respondents were the owners of the steam tug Astoria, then serving under the laws of Oregon, as the pilot and tugboat at the mouth of the Columbia; and that the libellants and respondent Wass were then employed thereon—the latter as master,

1 [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]
2 [Affirmed in Case No. 12,000.]

Roff as engineer, Devine as fireman, and Young and Shively as seamen.

That on the morning of said day the Astoria, being in Baker's bay, and Flavel being on board, it was observed that the Falkinburg, which had crossed the bar inward the evening before, and anchored near the foot of Sand Island, was drifting in the direction of the breakers, and thereupon, at the solicitation of Flavel, who was the principal owner of the Falkinburg, the Astoria, with the consent of the libellants, went to her assistance, and succeeded in saving the vessel and cargo, which would otherwise have been a total loss. That the Falkinburg was of the value of $10,000 and her cargo of the value of $15,-000. That afterward the parties for whose benefit said salvage service was performed paid to the master and other owners of the Astoria the sum of $5,000 therefor, which was a reasonable compensation for such service, and that the libellants have received no portion thereof, but said master and owners have wrongfully converted the same to their own use.

The respondents except to the libel for insufficiency: (1) Because it appears that the persons who performed the alleged salvage service were bound by law so to do; (2) that the libellants are not precluded from recovering salvage for their alleged service from said vessel and its owners, and therefore cannot maintain this suit to recover any portion of the sum paid respondents; (3) that it does not appear that this $5,000 was paid to respondents on account of the service done by libellants; (4) that it does not appear but that the persons who preformed the alleged service were bound by law so to do.

The first and last exceptions are only different forms of the same objection, and will, therefore, be considered as one. They both rest upon the assumption that by the pilot laws of the state, the Astoria was bound to render the assistance to the Falkinburg that she did, and therefore her master and crew are not entitled to compensation therefor as salvors.

Admitting the soundness of this position for the time being, I seriously doubt whether the respondents, after receiving compensation for this service as salvors, are not estopped, as against these libellants, to say that they were not entitled to such compensation, and are, therefore, not accountable to the latter for any portion of it. The Centurion [Case No. 2,554]. It may be that the respondents might receive a gratuity from the owners of the barkentine and her cargo, on account of an extraordinary risk incurred or service rendered by the steam tug while in the successful discharge of her duty, without becoming liable to the crew for any portion thereof. If the service performed was within the line of the steam tug's duty, as prescribed by law, no one engaged in it is entitled to anything more than ordinary compensation for his services.

But as it appears that the master and crew of the steam tug were, upon this occasion, acting beyond the line of their duty, and as salvors, it is not necessary to consider this question further.

The pilot act of October 28, 1868, ses. laws, 28, provides for the employment of a steam tug at the mouth of the Columbia river, to serve as a pilot and tow-boat on "the pilot grounds between Astoria and the open sea." For towing and piloting sail vessels in and out over the bar a uniform rate of compensation is allowed in proportion to the draught of the vessel; in addition to which a bonus or subsidy of $30,000 is given to the tug by the state, in five annual installments, commencing with $12,000 and diminishing gradually to $3,000. The boat is required to be "at least of sufficient size, strength and motive power for the purpose of towing and piloting vessels across said bar in all weather, when it can be crossed by the best class of steamers and sailing vessels;" but no provision whatever is made for extra compensation for extraordinary services, or requiring aid to be given to vessels in distress, except what follows:

By the last clause of section five, it is provided that the tug "shall at all times carry a sufficient supply of provisions and water, as may be necessary for the relief of vessels in distress; and it shall be the duty of the master and pilots, at all times, to offer such aid to vessels in stress of weather."

The provision is taken bodily from section ten of the pilot act of October 16, 1860 (Or. Code, 1841), without noticing or repealing it, and is a specimen of the lack of skill and knowledge displayed in the preparation of the whole act. The phrase "in stress of weather," applied to a vessel, means under the force of adverse weather—windbound or becalmed—so as to be unable to prosecute her voyage with the necessary dispatch. The act of 1860, supra, in which this provision is first found, did not contemplate or provide for a tug-boat on the bar, but only a sail vessel to carry pilots out to vessels beyond the bar. In early days vessels were sometimes kept off the bar waiting for a favorable wind to enter, until they became short of food and water. A pilot might go out to a vessel so situated, on a sail-boat, and be unable to bring her in; but if he was prepared to offer her food and water, one of the most serious consequences of the delay would be avoided.

This is the origin of the provision. What does it require of the pilots on the Astoria? Simply two things: (1) That they carry provisions and water for relief of vessels in distress; and (2) that they offer such aid to vessels in stress of weather. The aid which they are bound to offer to vessels in stress of weather is not aid generally, but only such aid as by the foregoing clause they are required to carry with them at all times, and be prepared to furnish for the relief of ves-

sels in distress—and that is, only provisions and water.

These exceptions are not sustained by this provision of the act; nor does it appear from any general consideration of the nature and terms of the employment of the tug, that she was bound to go to the rescue of the Falkinburg. As a pilot-boat merely, certainly she was not. The duty of a pilot-boat is to navigate a vessel over and upon his pilotage ground, and this presupposes that she is in a condition to be navigated. As appears from the libel, the Falkinburg could not, under the circumstances, have been navigated out of the peril she was in when discovered by the steam tug on the morning of January 13. She had crossed the bar the night before without a pilot, and anchored inside. When discovered she had lost one anchor, and was dragging the other. The wind, which was blowing a gale, was driving her on the breakers near by, and the sea was breaking over her. She was at the mercy of the winds and waves, and no mere pilotage service could have rescued her from the imminent danger she was then in.

But the act also makes it the duty of the steam tug to tow sail vessels upon this pilotage ground. The undertaking of her owners is to furnish towage as well as pilotage to vessels between Astoria and the open sea. It was mainly on account of the insufficiency of a mere pilot service in the case of sail vessels, that the legislature provided for the employment of a steam tug as a means of furnishing a reliable motive power for the navigation of such vessels over and upon the bar.

So long then as it is reasonably safe to take a vessel in tow anywhere upon this pilotage ground, the steam tug is bound to do so, and is not entitled to compensation therefor as a salvor.

But she is not bound to incur any extraordinary risks to tow a vessel. Her undertaking is not to rescue vessels from danger of shipwreck, at any risk to herself, but only to tow them in and out over the bar in all weather and under all circumstances, when it can be done with reasonable safety to herself and crew. It must be borne in mind that a sail vessel may be in an extremely perilous position, on or inside the bar, on account of adverse winds or currents, when a steam tug may take her in tow with impunity. In such case, although the sail vessel is rescued from imminent danger, the tug is not therefore a salvor, because the service was in the line of her duty, and done without extraordinary risk or labor on her part.

Taking these rules for a guide, I conclude that the steam tug was not bound to take the Falkinburg in tow, under the circumstances in which she did. It appears to have been done at extraordinary risk to herself and crew, and therefore it was a salvage service and not a mere towage.

The authorities mainly relied upon for the conclusion reached upon this branch of the case, are The Wave [Cases Nos. 17,297, 17,-300]; Lea v. The Alexander [Id. 8,153]; Le Tigre [Id. 8,281]; Hobert v. Drogan, 10 Pet. [35 U. S.] 120; The H. B. Foster [Case No. 6,290].

The second exception makes an immaterial issue. Admitting the libellants might maintain a suit against the barkentine and her owners, for their shares of the salvage earned in rescuing her from destruction, notwithstanding the payment of the $5,000 to respondents, it does not follow that they are bound or ought, under the circumstances, so to do. If, as is alleged, the matter has been adjusted with the respondents, and they have received a compensation for the whole service, the libellants may affirm such settlement and payment, so far as they are concerned, and recover their shares of it, as money had and received to their use; and this suit is such an affirmance.

In the case of The Centurion [Case No. 2,554], it was held, that where one vessel renders assistance to another in distress, and the master of the assisting vessel receives a gross sum as compensation for such service, that he is liable to one of his crew for a reasonable share of such compensation; and this whether the service performed was a salvage service or not, so long as it was not within the scope of the seamen's ordinary duty.

When these libellants shipped on the tug, they contracted to perform the ordinary duty of persons in their position on the pilot and tug-boat, for the ordinary compensation, and not to risk their lives as wreckers; and although they are bound to aid in the rescue of the Falkinburg, if required by the master, they were also entitled to a reasonable share of the special compensation for such extraordinary services and risk. In The Centurion, supra, Mr. Justice Ware, in discussing this subject, says:

"I do not mean to say that when a vessel, in the course of her voyage, falls in with a wreck, and the master thinks proper to make an attempt to save it, that the seamen are not bound to obey him; on the contrary, I hold they are. The customs and usages of the sea, silently assented to by the whole maritime world, appear to authorize the master in such cases to employ his vessel and crew in rescuing from destruction property thus exposed. The Boston [Case No. 1,673]. It is an authority that is allowable in the general interest of commerce; and the invariable custom of courts of maritime jurisdiction is to remunerate and encourage such services by a liberal and generous reward. But, though the authority for engaging in such enterprises rests solely in the discretion of the master, yet he is considered as acting not for himself alone, but for the common benefit of all who participate in the risk. In the distribution of the salvage, the owners are compensated for the use of their vessel, and the crew for their share of the peril and

labor. It is a service which is not contemplated in the contract with the crew, and which they are not by the terms of their contract bound to perform, but it is a duty imposed by the policy of the law, and the law compensates them for it by a liberal reward."

It is clear, both upon reason and authority, that the master of a salvage vessel, in adjusting and receiving compensation for salvage service, is acting as agent for the owners and crew, and is responsible to them for their respective shares thereof. And where, as in this case, it happens that the compensation is received by the owners of the salving ship in the first instance, the result is the same: they are liable to the crew for their respective portions of the amount received.

The third exception is not well taken in point of fact. The libel expressly alleges that the libellants assisted to perform the salvage service in question, and that the respondents received the sum of $5,000 therefor. It follows that the money was received by the respondents on account of these services, and ultimately for the benefit of whoever was entitled to it. Nor was it in the power of the master or owners of the Falkinburg to pay this salvage in full, and thereby discharge the vessel from liability therefor, and at the same time limit the benefit of such payment to the owners of the steam tug, or any persons other than those who participated in the risk and labor of earning it, and who by law and right were entitled to it.

The exceptions are disallowed.

[On appeal to the circuit court the decree of this court was affirmed. Case No. 12,000.]