THE JAMES P. DONALDSON.

*(District Court, E. D. Michigan.   July 9, 1883.)*

1. TOWAGE—CHOICE OF ROUTE—DISCRETION OF MASTER.
    Where the propriety of the general course to be taken by a tow from one port to another depends largely upon the season of the year, the state of the weather, the velocity of the wind, the probability of a storm, and the proximity of harbors of refuge, the choice of a route is usually within the discretion of the master of the tug; and if he has exercised reasonable judgment and skill in his selection he will not be held in fault, though the court may be of opinion that the disaster which followed would not have occurred if he had taken another route.

2. SAME—REFUSAL TO CROSS LAKE—STORM.
    A like rule obtains with reference to the conduct of the master in refusing to cross the lake or turn back to the port of departure in face of a storm.

3. SAME—INTOXICATION OF MASTER.
    The intoxication of a master upon duty ought not to be inferred from slight circumstances equally consistent with a different theory, or from the equivocal testimony of one or two dissatisfied seamen, when flatly contradicted by the remainder of the crew.

4. SAME—ABANDONMENT OF TOW—GENERAL AVERAGE.
    The abandonment and ultimate loss of a tow of barges to save the tug from destruction, and the subsequent arrival of the tug in a port of safety, does not vest in the owners of the barges a claim against the tug for contribution in general average.

In Admiralty.

These were consolidated libels against the propeller James P. Donaldson, to recover for the abandonment and subsequent stranding and loss of the barges Eldorado and George W. Wesley, some three or four miles below Erie, Pennsylvania, upon the evening of November 20, 1880. The conceded facts were substantially as follows: That the barges in question, together with the barge Bay City, left Buffalo

in tow of the Donaldson about 9 P. M. of November 19th, bound for Bay City, Michigan. None of the tow were laden except the Bay City, which carried a small cargo of coal. There was a light breeze from the S. E., which changed about 3 in the morning to the south-ward and westward, and became somewhat fresher. It continued S. W. and S. S. W. during the entire day, with indications of veering still further to the westward, and by evening was blowing a gale from S. S. W. On leaving Buffalo, the propeller took a S. W. course, in order to obtain the advantage of smoother water off the S. shore, and kept substantially the same course until about dark, when the lights of Erie harbor were made, eight or ten miles distant. The progress of the tow during the whole day had been very slow, not ex-ceeding two and one-half miles per hour, and for some time prior to the abandonment the propeller could do little more than to keep her tow headed to the sea. About 8 or 8:30 o'clock, the wind, which had been blowing hard from S. S. W. by S., suddenly veered into a N. W. or W. N. W. squall of great violence, accompanied by gusts of snow, striking the Donaldson on her starboard bow, and forcing her head around toward the shore so far that she was heading nearly S. ½ E. during its continuance. This squall lasted from six to ten min-utes. During its continuance the Donaldson and her tow, with wheel hard-a-port, drifted helplessly before its fury, until, according to the theory of the propeller's crew, they had come within about three-quarters of a mile of the shore, when the squall ceased as sud-denly as it had arisen, and the wind dropped back instantly to S. W. by S., and so continued for 20 or 30 minutes. About 9 o'clock a second squall struck the tow, even harder than the first. The pro-peller immediately put her wheel hard-a-port, but without effect. She continued to swing off before the gale, heading for the shore. When she had drifted to within about 600 feet of the reef which lines the shore at that point, seeing there was no escape except by flight, she gave the proper signal, cast off her line, abandoned the barges, and made for the entrance to Erie harbor, and there came to anchor. The barges drifted ashore and were lost.

The libelant charged the master with the following faults: (1) In failing to take the usual and proper course up the lake. (2) In not keeping far enough from the shore to handle his tow and to come round in case of a sudden squall or high wind from the west; and in leaving the deck to his mate without sufficient cause. It was also charged in this connection that the master was intoxicated during the afternoon and evening.

*Moore & Canfield*, for libelants.

*H. H. Swan*, for claimants.

BROWN, J. I will proceed to consider the several allegations of negligence charged against the master of the propeller.

1. In regard to the general course of the tow in leaving Buffalo. The usual and ordinary course up the lake from Buffalo to the mouth

of the Detroit river is W. by S. ¾ S., considerably to the northward of the course actually taken. This would carry the tow close to Long Point, and thence in a straight course to the narrow channel between Pointe Au Pelee and Pointe Au Pelee island. Had Captain Towle adopted this course, it is very probable that he could have taken shelter behind Long Point and weathered out the gale, as several other vessels did which left Buffalo about the same time. But the wind was from the S. E., the season was late, and the weather treacherous. By taking the course along the S. shore he could secure much smoother water, and would easily have been able to make the harbor of Erie, had not the wind kept canting to the westward and increasing in violence. There is some testimony tending to show that a S. E. wind at that season of the year frequently, but not invariably, changes to a gale from the S. W. or W.; but as the wind was light when the tow left Buffalo, I think it is demanding too much of the master to require him to forecast the weather for the following day. We have no right to expect in him greater weather wisdom than is found among the most experienced and scientific observers.

There is a great conflict of testimony as to the propriety of the course taken by the tow in leaving Buffalo. Some vessels which left on the same day took the northerly route and gained shelter behind Long Point. Others took the southerly route and made the harbor at Erie before the gale struck them. I think it is clearly one of those cases where the master might, in the exercise of sound judgment and reasonable discretion, have taken either course without being chargeable with negligence. His choice, of course, was largely dependent upon the season of the year, the state of the weather, the velocity of the wind, the probability of a storm, and the proximity of harbors of refuge, and we are not inclined to review his judgment in that particular. The disaster which befel him undoubtedly tends to show that he made the wrong selection, but the propriety of his action must not be determined by the result. He can only be chargeable with negligence when he takes a course which good seamanship would deem unauthorized and reckless. "The owner of a vessel does not engage for the infallibility of the master, nor that he shall do in an emergency precisely what, after the event, others may think would have been the best." *The Hornet, (Lawrence v. Minturn,)* 17 How. 100; *The Star of Hope,* 9 Wall. 230; *The W. E. Gladwish,* 17 Blatchf. 77, 82, 83; *The Mohawk,* 7 Ben. 139. *The Clematis,* 1 Brown, Adm. 499.

Libelants also claim in this connection that the propeller could either have crossed the lake and taken refuge under Long Point, or could have come about and returned to Buffalo as the master saw the storm approaching. I do not think he was bound to do this. So long as he could make his way against the wind he was as likely to make the harbor of Erie in safety as he was to make Long Point; indeed, it would seem, with the wind blowing a gale from the S. W., there would

have been lack of good judgment in the master exposing himself to a beam wind and sea, by attempting to cross the lake. Whether he should attempt to turn about and make the harbor of Buffalo was also a question upon which he was at liberty to exercise his judgment. He deemed it a more prudent course to proceed directly to Erie, and I am by no means satisfied that he was not correct.

2. In not keeping further from the shore as the propeller approached Erie. It is charged in this connection that Capt. Towle was under the influence of liquor that afternoon, and left the deck at the time he was most needed, to a mate who had no knowledge of the shore at that point. There was no question made of Capt. Towle's general competency, and I can see nothing to criticise in his management of the steamer after he took command. The charge of intoxication rests upon his admission that he drank in a saloon on the day he left Buffalo; that he had sent on board a jug of whisky as a part of the sea-stores which he kept in his room, and that there was an empty whisky bottle found on the floor the morning after the accident. Webster, the steward, who found the empty bottle, testified that the captain's appearance that night indicated to him that he had been drinking; that his eyes were red, and he looked stupid. But he says he saw nothing otherwise to indicate that he had been drinking, and that this appearance might have been owing to his facing the storm. This is also corroborated by the testimony of one or two others of the crew, who confessed to having quarreled with Capt. Towle. It is denied, not only by Capt. Towle himself, who swears that he drank nothing that day, and that there had been no whisky in the bottle for three months, but by all the rest of the crew, who swear that they never saw or heard of his drinking too much while upon the propeller. It is pertinent in this connection to notice that the pleadings give no intimation that such an accusation was contemplated, nor was it suggested by the libelant in his testimony before the steam-boat inspectors at Port Huron, who inquired into the cause of the loss. Upon the whole, it does not seem to me that the offense has been proven. So grave a charge as this ought to be substantiated by something more than trifling incidents which are quite consistent with another theory, and the testimony of two or three disaffected men, contradicted, as it is, by nearly the entire crew.

The most serious question in the case is whether the propeller kept her tow as far away from the shore as she should have done under the circumstances. As I have already observed, I do not think the master was bound to contemplate the contingency of turning about and going to Buffalo, or of crossing the lake under a beam wind and seeking shelter at Long Point, when he was already so near to Erie, but he was bound to keep far enough from shore to escape the danger of running upon the reef at that point as the wind and sea then were. Capt. Towle's watch ended at noon, but as the weather was heavy he remained on deck until 5 o'clock, when he left

the propeller in charge of the mate, an experienced seaman, but not very familiar with the approach and entry to the harbor at Erie. Between 7 and 8 o'clock he came on deck again. The tow was then, as he claims, from a mile to a mile and a half from shore, with no indications of immediate peril. Libelants, however, claim that she had been allowed by the mate to drift to within a half a mile of the shore, and was nearer than was customary or safe for vessels in entering the harbor. There is a very considerable conflict of testimony upon this point. While I am disposed to give considerable weight to the testimony of Henry, the keeper of the light at the Beacon ranges; of Clark, who was in charge of the life saving-station; and of Pherrin, who lived about four miles from Erie and very close to the shore; at the same time it is entirely possible that their observations might have been made after the first squall had struck the tow and when she had undoubtedly gotten much to the southward of her proper course. The testimony of the crew of the propeller is substantially that she was kept upon the usual heading towards the Erie lights, and in the darkness and storm of that evening it must have been very difficult for those upon the tow to determine their distance from the shore. Libelant Slyfield admits he could not tell the distance. Upon the whole I do not think libelants have made out this branch of their case by a preponderance of testimony.

This includes all the charges of negligence which were urged upon the argument. In my opinion, the loss was occasioned by a peril of the sea. The disaster occurred during the prevalence of the worst storm of the season of 1880. All the ship-masters who were exposed to it united in pronouncing it a "living gale of wind," and one of the most sudden and violent within their memories. The report of the signal service filed characterized it as "a furious westerly gale; a thick, blinding snow storm." Such was its violence, at the very time the Donaldson was struggling off the shore, that the steamers which had taken refuge under Long Point were obliged to keep their engines working at full speed, and even then could not hold themselves up to their anchors, while at least one barge was lost there. In Erie harbor another powerful steam-barge, during the same squall, had to let go her barges, because she could not hold them. With such weather as this in sheltered roadsteads, it is easy to conceive the peril to which the Donaldson with her tow was exposed in making their way along the open lake, with furious squalls driving them directly upon a lee shore. While the conduct of the tow may not have been above a searching criticism, we think it quite apparent that it would have been useless to contend against the furious squalls from the N. W.; and that the propeller cannot be justly held in fault for abandoning her tow and seeking safety where she could find it. Indeed, it was not claimed but that the abandonment, when actually made, was not necessary to save the propeller.

3. But it is urged by libelants that even if the propeller be exoner-

ated from all charges of negligence in respect to the conduct of her tow upon that occasion, she is still liable for her proportion of the value of the lost barges, in general average,—that here was a common danger; a danger imminent and apparently inevitable, in which all participated; a voluntary jettison of the barges for the purpose of saving the propeller; or in other words, a transfer of the peril from the whole to a part of the tow; and that this attempt was successful; and therefore the propeller may be called upon for contribution. The proposition is a novel and interesting one. I know of no case in which it has even been discussed. Indeed, the very fact that no claim of this description has ever been made is worthy of suggestion as indicating the view generally taken by the profession. It is true there are in this case many of the elements which go to entitle the barges to a general average contribution, as stated in the leading case of *Barnard* v. *Adams*, 10 How. 270; still I know of no case wherein the principle of mutual contribution has been extended beyond the ship, her boats, tackle, apparel, furniture, and cargo. I understand the law of general average to be an outgrowth of the law-maritime as applied to the carriage of goods by sea. It is never applied to cases of a voluntary sacrifice of property upon land when made to preserve the property of others from a greater loss. For instance, if the house of A. be torn down, or is blown up in a conflagration, to save the houses of B., C., and D., A. has no right to contribution, be the evidence never so clear that the sacrifice was successful, and saved the property of B., C., and D. from destruction. Indeed, the cases have gone so far as to hold that the parties themselves who commit an act of depredation for the public safety are not liable in trespass. Says Judge DILLON, in his work upon Municipal Corporations, vol. 2, § 756:

"The rights of private property, sacred as the law regards them, are yet subordinate to the higher demands of the public welfare. *Salus populi suprema est lex.* Upon this principle, in cases of imminent and urgent public necessity, any individual or municipal officer may raze or demolish houses and other combustible structures in a city or compact town, to prevent the spreading of a destructive conflagration. This he may do independently of statute, and without responsibility to the owner for the damages he thereby sustains."

It was said, so long ago as the reign of Edward IV., that "by common law every man may come upon my land for the 'defense of the realm.' "

In the *Saltpetre Case*, 12 Coke, 13, it is said that "for the commonwealth a man shall suffer damage; as, for saving of a city or town, a house shall be plucked down if the next be on fire; and the suburbs of a city in time of war, for the common safety, shall be plucked down,—and a thing for the commonwealth every man may do without being liable to an action."

In *Mouse's Case*, Id. 63, certain passengers upon a ferry-boat from Gravesend to London cast overboard a hogshead of wine and other

ponderous things to save the boat from being swamped in a violent tempest. It was held that as this was a case of necessity for the saving of the lives of the passengers, the defendant, being a passenger, was justified in casting the hogshead of the plaintiff out of the barge. See, also, *Governor, etc.*, v. *Mcredith*, 4 Term R. 794; *Respublica* v. *Sparhawk*, 1 Dall. 357; *Taylor* v. *Plymouth*, 8 Metc. 462; *Mayor, etc.*, v. *Lord*, 17 Wend. 285; S. C. 18 Wend. 126. A like principle was applied in the Roman law, wherein it is said that' if, by the force of the winds, a ship is driven against the cables of another, and the sailors cut these cables, no action will lie, if the ship cannot be extricated in any other way.

In the case of *The John Perkins*, 21 Law Rep. 87, Mr. Justice Curtis decided a case which involved somewhat the same principle as the one under consideration. In this case one of the crew of a fishing schooner cut her cable in order to prevent a collision with another vessel and the destruction of both, and claimed a general average contribution for the loss of his cable and anchor. Judge Curtis dismissed the libel, saying that, in his opinion, the only subjects bound to make contribution are those which are united together in a common adventure and placed under the charge of the master of the vessel, with authority to act in emergencies as the agent of all concerned, and which were relieved from a common peril by a voluntary sacrifice made of one of those subjects. The only opinion I have found to the contrary is that of Casaregis, an eminent civil law writer, who puts the case of the destruction of a vessel in port, lying near to another vessel which is on fire, to prevent the flames from spreading and being communicated to other vessels. He considers the compensation to the owner of the vessel thus destroyed as a proper subject of maritime contribution by the owners of the other vessels and cargoes which were saved from the impending peril. Disc. 46, No. 4563. I have found this opinion wholly irreconcilable with the opinion of Mr. Justice Curtis above quoted.

From this review of authorities it is quite apparent that the doctrine of general average contribution arises from the peculiar relations existing between the ship and her cargo. Mr. Lowndes finds the underlying principle in the agency of the master to act for the owner of the cargo in cases of unforeseen danger. Lowndes, Av. 14–16. This would clearly have no application to the case of a vessel whose master remains in command of his own ship, and usually has no opportunity of conferring with the master of the tug in emergencies of this description. The master of the tug is in no sense the agent of the tow for any such purpose.

The difference between the relations of a ship to her cargo and those of a tug to its tow will not escape the observation of the most casual observer. Ordinarily, the master of the ship has but a single duty to perform, namely, the delivery of his cargo to the consignee; and for the time being, and for that purpose, the owner of the cargo

yields possession and abdicates his authority to the master. For the performance of this duty the master binds himself, his ship, and its owners by the most stringent obligations of the law. His undertaking is absolute that his ship is seaworthy; that he and his crew are competent and honest; that he will use due care in lading and unlading his cargo; that he will protect it from thieves; and will navigate his ship to her port of destination without unnecessary delay or deviation. Indeed, he is liable for every mishap to the cargo not attributable to the owner's fault, saving and excepting only the perils of the sea and the acts of public enemies. He cannot sell or hypothecate the cargo, except in case of urgent necessity, and not even then, without communication with the owner, if such communication be possible. Even if the vessel be wrecked, and his goods are cast upon the shore, neither he nor his crew are entitled to salvage for preserving them. Jones, Salv. 20.

On the other hand, if the cargo be once laden on board, the master has the right to carry it to its destination and detain it for payment of freight. Even if the voyage be temporarily interrupted or broken up, he has the right to tranship the cargo and forward it by another vessel. From the intimacy of their relations, from the common danger incident to their common adventure, and to prevent the master from sacrificing the cargo at the expense of the ship, there is attached the further anomalous feature that all sacrifices rendered necessary by the elements shall be borne mutually by the ship and cargo; whether the loss be occasioned by cutting away a mast or throwing overboard a bale of goods, it shall be borne by the owners of the ship and cargo in exact proportion to the value of their respective interests.

On the contrary, the obligations of the tug to her tow are discharged by the employment of reasonable care and skill. The master of the tug guaranties that she is seaworthy and properly equipped; that he will furnish the motive power and will use his best endeavors to take his tow to the place of destination in safety. He does not, however, take charge of the ship except so far as may be necessary to direct her course. In all other respects the master and crew of the tow have entire control of her movements, and may adopt such independent measures for her preservation and safety as their own judgment may dictate. He does not insure the ship against anything but the consequences of his own negligence, nor her cargo from the depredations of thieves or the barratry of the crew. If the performance of his contract be interrupted by any unforeseen or extraordinary peril not within the contemplation of the parties, such as the slipping or breaking of a line in a heavy sea, he is at liberty to treat the original contract at an end; and while he has no right to abandon his tow except to save his own vessel, he may recover salvage as if he were a stranger, if he has put his own vessel in peril to rescue her. *The Saratoga*, Lush. 318; *The Robert Dixon*, 4 Prob.

Div. 121; S. C. 5 Prob. Div. 54; *Roff* v. *Wass*, 2 Sawy. 389; *The J. C. Potter*, 3 Mar. Law Cas. 506.

As observed by Lord KINGSDOWN, in delivering the opinion of the privy council in the case of *The Minnehaha*, Lush. 335, 347:

"She may be prevented from fulfilling her contract by a *vis major*, by accidents which were not contemplated, and which may render the fulfillment of her contract impossible, and in such case, by the general rule of law, she is relieved from her obligations. But she does not become relieved from her obligations because unforeseen difficulties occur in the completion of her task; because the performance of the task is interrupted, or cannot be completed in the mode in which it was originally intended, as by the breaking of the ship's hawser. But if, in the discharge of this task, by sudden violence of the wind or waves, or other accidents, the ship in tow is placed in danger, and the towing vessel incurs risks and performs duties which are not within the scope of her original engagement, she is entitled to additional remuneration for the additional services if she be saved, and may claim as a salvor, instead of being restricted to the sum stipulated to be paid for mere towage."

The rule is the same with respect to pilots. *The Eolus*, 1 Asp. Mar. Law Cas. 516, and note; *The Hope*, (*Hobart* v. *Drogan*,) 10 Pet. 108; *Akerblom* v. *Price*, 4 Asp. Mar. Law Cas. 441; *The Wave*, Blatchf. & H. 235.

It is not claimed that the distinctions here taken are decisive against the allowance of a general average contribution in cases like these. They do, however, show that the whole law upon this subject has arisen out of the anomalous relations between the ship and cargo—relations such as do not exist between a tug and tow. In my opinion, the law of general average is confined to those cases wherein a voluntary sacrifice is made of some portion of the ship or cargo for the benefit of the residue, and that it has no application to a contract of towage.

A decree will be entered dismissing the libels, with costs.